# CHARLESTON.

BOYCE *v.* MONTAUK GAS COAL CO. *et al.*

Submitted June 7, 1892.—Decided November 26, 1892.

1. CORPORATIONS — FORECLOSURE — ULTRA VIRES — CONTRACT — AGENT—SEAL.

Where a bill is filed by a party representing himself to be a mortgagee of real estate, for the purpose of enforcing a mortgage which purports to have been regularly signed, sealed and acknowledged by the president and treasurer of a corporation chartered under the laws of the State of New York, which real estate is situated in this State, objection to the validity of said mortgage can not be made by the company on the ground that it is *ultra vires*, but must be made by a stockholder or by stockholders of said company.　(p. 84.)

2. CORPORATIONS—SEAL—CONTRACT—AGENT.

If a deed or contract purport to be sealed with the seal of a corporation, and it is proven to be signed by the proper agents of the corporation, the presumption is that the seal was regularly affixed by the proper authority ; and a contract under seal, executed by an agent within the scope of his appointed power, will be held valid and binding upon the corporation until evidence to the contrary has been introduced.　(p. 90, 91.)

3. CORPORATIONS—STOCKHOLDERS—LACHES.

While a minority of the stockholders of a corporation may maintain a bill in equity, in behalf of themselves and other stockholders, for fraud, conspiracy, or acts *ultra vires*, against a corporation, its officers, or others who participated therein, when the minority stockholders have been injured by said act, they must act promptly and not wait an unreasonable time.　If they postpone their complaint for an unreasonable time, they forfeit

their right to equitable relief. Nothing will call a court of equity into activity but conscience, good faith and reasonable diligence. When these are wanting, the court is passive and does nothing. (p. 86, 88.)

4. CORPORATIONS—STOCKHOLDERS—LACHES—CONTRACT.

Where a stockholder has notice or the means at hand of becoming acquainted with the contracts made by the corporation in which he is such stockholder, a court of equity will not allow him to remain quiet an unreasonable length of time, with a view of ascertaining whether the contract will result in profit to him, and then repudiate the contract if it has resulted in loss. (p. 91.)

*F. Woods, B. F. Martin* and *W. I. Fisher* for appellant:

I.—*Plaintiff's mortgage lacks no essential of validity, even under the laws of New York.*—122 N. Y. 177 ; 25 W. Va. 184.

II.—*The mortgage is valid in West Virginia.*—Burr. Assign. § 304 ; 7 G. & J. 480 ; 1 H. & J. 622, 710 ; 2 Beach Priv. Corp. § 742 ; Add. Cont. *194 ; Whar. Confl. L. § 372 ; 9 All. 78 ; 7 Cr. 115 ; 9 Wheat. 565 ; 10 Wheat. 202 ; 1 Dev. Deeds § 837 ; Sto. Conf. L. (8th Ed.) §§ 424, 463 ; Bish. Cont. § 1395 ; 2 Par. Cont. (7th Ed.) *572 ; Sto. Conf. L. §§ 428, 447, 435 ; Whar. Conf. L. §§ 372, 676 ; Aug. Am. Corp. § 221 ; 101 U. S. 625 ; 1 Jones Mort. § 124 ; Kyd Corp. 69, 76, 78, 108 ; 2 Kent Comm. 281 ; 93 Ill. 153 ; 14 All. 381 ; 1 Wat. Corp. § 124 ; 1 Dev. Deeds § 388 ; 1 Mor. Corp. §§ 510, 513 ; 2 Beach Corp. § 743 ; 5 Watts & S. 223 ; 30 W. Va. 123 ; Id. 444 ; 3 Gratt. 215 ; Id. 236 ; 75 Va. 701 ; 20 W. Va. 450 ; Acts (1881) p. 428.

III.—*The October contract.*—Ran. Cont. 189 ; 2 Add. Cont. (8th Ed.) *1169 ; 10 Pet. 360 ; 1 Wall. 221 ; 2 Beach Priv. Corp. §§ 424, 425 ; Cook Stock & Stockhol. § 682 ; Sedg. Constr. L. 73 ; 1 Wat. Corp. § 161 ; 98 U. S. 629 ; 2 Mor. Corp. §§ 688, 689 ; Green Ult. Vir. (2d Ed.) 717 ; 96 U. S. 341 ; 63 N. Y. 70 ; 57 Md. 129 ; 29 Md. 524 ; 22 N. Y. 508 ; 106 N. Y. 473 ; 93 N. Y. 609 ; 97 N. Y. 378.

IV.—*Davis Land Purchases.*—Big. Estop. 365, 366 ; 2 Herm. Estop. §§ 585, 606, 607, 613 ; 1 Dev. Deeds § 992 ; 11 How. 325 ; 21 How. 240 ; 2 Dev. Deeds § 944.

V.—*Vendor's Lien.*—2 Sto. Eq. § 1217 ; Id. § 1218 ; 4 Kent Comm. *152 ; 23 W. Va. 122 ; 8 Gratt. 148 ; 11 G. & J. 245 ; 29 Md. 119 ; 59 N. Y. 541 ; 80 N. Y. 345 ; 33 W. Va.

761; 21 W. Va. 516; 30 W. Va. 790; 2 Min. 296, 297; 3 Pom. Eq. § 1235 ; 1 Lom. Dig. 317.

VI.—*Future Advances.*—14 W. Va. 531 ; 29 Gratt. 483 ; 99 N. Y. 547; 101 U. S. 622, 626; Sto. Conf. L. § 280; Greenh. Pub. Pol. 48; Whar. Conf. L. 401 ; Bish. Cont. § 1390 ; 2 Par. Cont. *583.

Replying to appellees' brief counsel cited the following additional authorities:   69 N. Y. 333 ; 96 N. Y. 473 ; 28 Fed. Rep. 169 ; 104 Ill. 463 ; 45 Mich. 103 ; Cook Stock &c. 839; 26 Hun 643 ; 2 Beach Priv. Corp. § 744; 110 U. S. 209 ; 80 Ill. 267; 55 Ill. 413 ; 69 Tex. 625 ; Green. Ult. Vir. 783 ; 81 Ga. 536 ; 59 N. Y. 541 ; 90 N. Y. 607; 78 N. Y. 159; 23 Atl. Rep. 846 ; 128 Pa. St. 119; 2 Beach Corp. §§ 431, 433 ; 33 Beav. 602; 88 Mass. 52 ; 1 Jones Mort. § 127.

*J. W. Mason* for appellees :

I.—*The mortgage is void.*—Laws of N. Y. (1871) c. 481, s. 2 ; 69 N. Y. 328 ; 96 N. Y. 472 ; 85 N. Y. 456 *et seq.*

II.—*Is it a West Virginia mortgage?*—13 Pet. 588; Mora. Corp. § 1047 ; Id. § 318.

ENGLISH, JUDGE:

This was a suit in equity brought in the Circuit Court of Taylor county by James Boyce against the Montauk Gas Coal Company, Henry G. Davis, Thomas Edward Hambleton, John A. Hambleton, Thomas Edward Hambleton, executor of Augustus McLaughlin, deceased, John T. White and David F. Hotchkiss, for the purpose of foreclosing a mortgage and obtaining a decree for the sale of certain lands, coal and coal privileges situated in said county.

The plaintiff in his bill alleged that on the 21st day of December, 1880, the defendant the Montauk Gas Coal Company, a corporation duly organized under the laws of the state of New York, by deed of mortgage of that date conveyed to him certain tracts of land, coal land and coal rights and privileges situate at or near Flemington, in Taylor county, in the State of West Virginia, which were conveyed to the said company by John White and Cornelia L. White, his wife, by deed dated the 6th day of November,

1879, a copy of which deed is exhibited;—that said Montauk Gas Coal Company also conveyed to him a certain other tract of land, coal land, and coal rights and privileges, also situate near Flemington, in said county and State, which were conveyed to said company by said John White and Cornelia L. White, his wife, by deed dated the 16th day of July, 1880, a copy of which deed was also exhibited;—that said company also conveyed to him by said deed a certain other tract of land near Flemington, in said county and State, together with all coal and coal privileges which were conveyed by Henry G. Davis and others to the said John White by deed dated the 5th day of May, 1880, being the same land, coal and coal privileges subsequently conveyed to the plaintiff by said John White and others by deed dated the 21st day of December, 1880, and being the same land, coal and coal privileges which the plaintiff sold to said the Montauk Gas Coal Company on the 21st day of December, 1880, at the price of sixty five thousand dollars, as set forth in said deed of mortgage;—that the lien reserved in said deed dated the 5th day of May, 1880, in favor of Henry G. Davis, Thomas Edward Hambleton, John A. Hambleton and Augustus McLaughlin, since deceased, has been paid and extinguished;—that in addition to said several parcels of land, coal and coal privileges, the said defendant conveyed unto the plaintiff, by said mortgage deed, all and singular the tenements, hereditaments and appurtenances belonging to said lands, coal and coal privileges or in any manner thereto appertaining together with the reversion, remainder, rents, issues and profits, and all estate, right, title, interest, property, possession, claim and demand, in law and equity—that is to say, the said company conveyed said lands, coal and coal privileges to the said plaintiff as fully, and to the same extent, that said company owned the same, which is fully shown by said deed of mortgage, a copy of which was exhibited with said bill.

After describing said lands, coal lands and coal privileges more particularly, as to their locality *etc.*, the plaintiff further alleged that said coal and land, with the right to mine and remove the same, as set forth in said several deeds, was the property of the said the Montauk Gas Coal Company,

and the only property embraced in said mortgage, and that no liens existed thereon in favor of any of said grantors or any other person except the plaintiff, who has an unpaid claim of one hundred and fifty thousand three hundred and sixty seven dollars and sixty six cents, with interest thereon from the 1st of September, 1885, until paid, which is a subsisting lien on said coal, coal rights and privileges, and land, by virtue of the said mortgage, and has long since been due from the said defendant the Montauk Gas Coal Company.

The plaintiff further alleged that on the 22nd day of October, 1880, said company entered into a written contract with him, by which he was to take charge of the coal mines and manage the mining operations and the business of the said company, situate in the county of Taylor, in the State of West Virginia;—that he should have exclusive control and management of the business, mining and operations, together with the principal office of the said company, in the city and State of New York; that possession and full control thereof were given him by said company on the 22d day of October, 1880, in pursuance of said contract; that the mining, shipping and selling of coal should be carried on under the exclusive control of the plaintiff, and the coal mined and shipped from the said defendant's mines should be sold, billed and shipped in the name of the plaintiff, who should collect the proceeds of all sales, but in the shipping thereof said coal should be designated as "Montauk Gas Coal Company's Coal;"—that among other things the plaintiff was to have for wharfage, labor and all expenses attending the receiving, shipping and billing of coal at the city of Baltimore, the sum of twenty five cents per ton on all coal shipped under said contract;—that the payment of the indebtedness of said defendant then existing, or that might thereafter be contracted during the continuance of said contract, should be under the exclusive management, supervision and settlement and control of the plaintiff;—that the plaintiff should be allowed interest at the rate of six *per centum per annum* on all moneys advanced by him for mining operations, freights or the liquidation of the liabilities of the said company, which then or thereafter might exist;

—that the moneys received by the plaintiff in the course of said business should be applied by him to the payment of moneys advanced by him in the management of said business, or on the debts then existing or that might thereafter exist;—that the profits of said business, if any, should be applied by the plaintiff to the fifteen thousand dollars indebtedness of John White and David Hotchkiss to him, and for which the said company was liable to the plaintiff;—that all moneys due or to become due the plaintiff by advances and expenditures in the prosecution of the business aforesaid should operate as a lien on the property and mines of said defendant, and that said contract was to continue in force from its date until the 1st day of January, 1882, which contract was also exhibited;—that on the 21st day of December, 1880, said company and the plaintiff, by written contract of that date, extended said contract of October 22, 1880, to the 1st day of January, 1883, and therein recited the sale by the plaintiff to said company of the coal field and privileges known as the "Davis Tract" at the price of sixty five thousand dollars, with interest from the date of said sale until payment, all of which should be paid on or before the 1st day of January, 1883, and changing the original contract so that any surplus or balance of money that should remain after paying the things stipulated to be paid by said first contract should be applied to said sixty five thousand dollars of purchase-money for said Davis tract, or so much thereof as should remain unpaid. Said last-named contract was also exhibited.

The plaintiff further alleged that in pursuance of said original contract, and said extension thereof, he took possession and control of said coal fields and mines, and proceeded to work and develop the same in accordance with the provisions of said contracts, and invested from time to time, in the management and working of said mines, and in the payment of the liabilities of said company from the 20th day of October, 1880, to the 31st day of December, 1882, the aggregate sum of six hundred and ninety four thousand three hundred and seventeen dollars and eighty cents, and from said 31st day of December, 1882, to the 1st day of January, 1884, the aggre-

gate sum of one hundred thousand and seventy nine dollars and thirty cents;—that plaintiff further advanced and paid for the said defendant from the 1st day of January, 1884, to the 1st of September, 1885, in pursuance of said contract, the further sum of two thousand six hundred and eighty six dollars and sixty seven cents;—that plaintiff also paid for the Davis coal tract, including interest, the sum of seventy thousand two hundred and ninety dollars and sixty seven cents, which, with the interest since accrued to the 1st day of September, 1885, amounts to eighty four thousand three hundred and sixteen dollars and seventy cents—that the foregoing, with interest added on the several items thereof to the 1st day September, 1885, amounts to the aggregate sum of nine hundred and thirty six thousand seven hundred and fifty seven dollars and forty seven cents.

The plaintiff further alleged that from the sale of coal and all other sources from November 16, 1880, to December 31, 1882, he received in pursuance of said contracts, six hundred and fifty four thousand four hundred and eighty six dollars and seventy cents—that from December 31, 1882, to January 1, 1885, he also received eighty nine thousand nine hundred and ninety dollars and eighty eight cents—that from January 1, 1885, to the 1st of September, 1885, he received from coal, etc., ninety two dollars and eighty four cents—which aggregate receipts, with interest computed to 1st of September, 1885, amounted to seven hundred and eighty six thousand three hundred and eighty nine dollars and eighty one cents; thus leaving due and wholly unpaid to the plaintiff the sum of one hundred and fifty thousand three hundred and sixty seven dollars and sixty six cents on the 1st of September, 1885, which is due the plaintiff from said company.

The plaintiff also alleged that in view of the large and necessary expenditures in the preparation for mining and shipping coal, and the payment of debts and liabilities of said defendant, said company on the 21st day of December, 1880, executed and delivered to him a mortgage on all the land, coal, coal rights, and coal privileges before mentioned, to secure him the payment of all moneys thereto-

fore expended and paid by the plaintiff for the said company, as well as all moneys that the plaintiff might thereafter expend and pay out for said defendant under and by virtue of said contracts, including the said purchase-money and its interest for said Davis tract of coal land, which mortgage was duly admitted to record on the 26th day of January 1881, in said county, and that the plaintiff, by virtue of said mortgage, has a subsisting lien on all said land, coal, coal rights, and privileges to secure the payment of said indebtedness to him; that said mortgage has long since been due and liable to foreclosure, and that there are no other liens on any of said property; and he prayed that the same might be foreclosed, a sale decreed of said property, and the proceeds applied to the payment of his debt, interest and costs.

The said Montauk Gas Coal Company, being a non-resident, was proceeded against by order of publication; and on the 26th day of March, 1886, the cause was heard upon the process executed upon the defendent Henry G. Davis, and the bill taken for confessed as to him. On order of publication duly executed as to the other defendants, proceedings at rules regularly taken and matured, and cause set for hearing, on motion of plaintiff the joint and separate answer of defendants, Henry G. Davis, Thomas E. Hambleton, John A. Hambleton and Thomas E. Hambleton, executor of Augustus McLaughlin, the deposition of James Boyce, Jr., Albert P. Goedecke, John P. Ayers, William N. Worley, and James Boyce, the exhibits referred to in and made part of said depositions, the exhibits filed with and made part of the bill, the court proceeded to foreclose said mortgage; and, it appearing to said court that there were no other liens upon said property, it was decreed that unless the plaintiff's claim of one hundred and fifty thousand and sixty dollars and thirty two cents with interest thereon from the date of said decree, and the costs of said suit, be paid to the plaintiff in sixty days from that date, special commissioners thereby appointed, after giving bond in the penalty of fifty thousand dollars conditioned as required, should sell said property to satisfy the plaintiff's claim aforesaid, and the costs of said suit, upon the terms

therein prescribed; and on the 26th day of July, 1886, the Montauk Gas Coal Company appeared and filed its petition asking a rehearing of the case, for reasons stated in its petition, and filed its bond conditioned according to law, on consideration whereof the said decree of March 26, 1886, was suspended, and said company was given leave to file its answer to plaintiff's bill, which answer was filed on 12th day of August, 1886, and the plaintiff replied generally thereto:

The said special commissioners also filed their report of sale of said property, which report was excepted to by said company, upon consideration whereof the court reserved its opinion as to whether or not said sale should be confirmed and referred the cause to a commissioner to ascertain and report what amount, if anything, said company owed the plaintiff, and whether the same was a lien or not upon the real estate of said defendant, and, if a lien, the nature, character, and priority of the lien, together with the property upon which it was a lien.

The Montauk Gas Coal Company, in its answer, alleged that it was a corporation under the laws of the state of New York, and was therefore a non-resident of the State of West Virginia, but denied that on the 21st day of December, 1880, it conveyed by deed of mortgage any of its lands in Taylor county to plaintiff, and said it was informed that certain persons claiming to act for respondent did on the 21st day of December, 1880, attempt to execute a mortgage on certain portions of its real estate, coal lands and coal privileges situate in Taylor county to plaintiff; but it utterly denied the authority of said David T. Hotchkiss, who pretended to execute said deed on the part of said company, to so act, and alleged that neither the board of directors nor said Hotchkiss, as president thereof, could legally mortgage its lands for the purposes therein expressed, without the consent of the stockholders first given; and it denied that any such consent was given.

It further alleged that the paper filed with said pretended mortgage, purporting to be the consent and assent of the stockholders, was fraudulent;—that the plaintiff signed said paper, representing himself as the owner of five thous-

and nine hundred shares of the stock, when in fact he did not own one share;—that many of the stockholders' names were signed to said paper by said David T. Hotchkiss without any authority whatever;—that said paper purporting to give authority to the board of directors and president to mortgage said property was fraudulent and void, and granted no authority;—and that said mortgage was executed by said Hotchkiss without authority, and is for that reason void.

Said company also denied that it owned said Davis land, or that it ever bought the same from plaintiff or any one else, and said plaintiff attempted to sell said land to respondent at the exorbitant price of sixty five thousand dollars, and got a mortgage on all of its land to secure the payment, but that said company never purchased it, never took any conveyance of it, never executed any obligations to buy it or pay for it, never had possession of it, and that the plaintiff still has the title and possession of it.

And said respondent alleged it was a fraudulent scheme on the part of plaintiff to annoy, cheat and defraud the stockholders of the defendant company, by attempting to so manipulate the affairs of the said company as to make the company's property liable for a parcel of land, at more than twice its value, which the company did not need and was in no condition to buy, intending thereby to get the entire property for nothing;—that plaintiff, well knowing the value of all of said lands, as well as the condition of the company, knew the company could not pay said sum of sixty five thousand dollars, and he also knew that very soon said sum of sixty five thousand dollars, with its interest and the costs attending a foreclosure of the mortgage, would consume the entire property of the company covered by said pretended mortgage.

Said respondent denied that it owed plaintiff anything, and demanded proof of every item of his account. It also denied that it should pay anything on account of said Davis land; that it should be charged with either of the notes of David T. Hotchkiss, of seven thousand five hundred dollars each, exclusive of interest, or that it should be charged with the salary of James Boyce, Jr., for pretend-

ed services as treasurer, he being the son of plaintiff, and acting as plaintiff's clerk, and not as treasurer, and says, if he were treasurer, the sum of two hundred and fifty dollars per month, which plaintiff pretends to have paid him, was largely in excess of what should have been paid, and that plaintiff's demand filed with his depositions, and upon which he claims, contained charges for many hundred dollars of usurious interest, and that, when his claim shall be corrected and properly stated, he will be largely indebted to respondent.

Said company also alleges that the board of directors of said company had no knowledge of the existence of this suit until about the first of July, 1886 ; that notwithstanding said James Boyce, Jr., at the time pretended to be treasurer of said company, and was demanding pay for his services as such, and that his deposition was taken by plaintiff in the case on the 12th day of March, 1886, yet he never informed any of the officers or directors of the company of the proceedings, but, as respondent charges, fraudulently withheld all information, in order to aid his father, the plaintiff, in securing judgment against respondent without its knowledge of the pendency of said suit; and said company denies the allegation that it is insolvent.

Ezra J. Stirling, a stockholder of said company on the 18th day of November, 1889, tendered his petition and asked leave to file the same, which was objected to by counsel for the plaintiff. The objection was overruled, and said petition was allowed to be filed, in which the same points were made as in the answer of said company, alleging that said mortgage was never properly and legally executed, and that the making of said contracts and the execution of said mortgage were to the prejudice of the stockholders of said company.

On the 25th day of April, 1891, a decree was rendered in said cause setting aside the decree of sale made therein at the March term, 1886, and the sale made in pursuance thereof, and directing that the costs of said sale, and expenses thereof, be paid by plaintiff; dismissing the plaintiff's bill; quashing the attachment which had been sued out by plaintiff and levied on the property of said company;

and directing the costs to be paid by plaintiff. But said cause was dismissed without prejudice to the plaintiff to institute and prosecute an action at law for any part of his account or demands against any of the defendants in said suit; and from this decree the plaintiff obtained this appeal.

The defendant the Montauk Gas Coal Company, by its answer, attempted to put in issue the validity of the mortgage which the plaintiff, by his bill, sought to enforce, claiming that neither the board of directors nor said Hotchkiss as president could legally mortgage said respondents' lands for the purposes therein expressed without the consent of the stockholders of said company first given; and it denies that any such consent was given, and says that the paper filed in this cause with said pretended mortgage purporting to be the consent and assent of the stockholders is fraudulent;—that the plaintiff signed said paper representing himself as the owner of five thousand nine hundred dollars shares of stock in said company, when in fact he did not own one share; that many of the stockholders' names were signed to said paper by David T. Hotchkiss without any authority whatever; and that said paper is fraudulent and void.

But when we examine the evidence we find that plaintiff did own five thousand nine hundred shares of said stock, and that said Hotchkiss was authorized to sign the names he did sign to said papers.

But while it is true that a New York statute provides that "any corporation formed under the act passed February 17, 1848, or of the acts amending or extending the said act, may secure the payment of any debt heretofore contracted or which may be contracted by it in the business for which it was incorporated, by mortgaging all or any part of the real or personal estate of such corporation, and every mortgage so made shall be as valid, to all intents and purposes, as if executed by an individual owning such real or personal estate, provided that the written assent of the stockholders owning at least two thirds of the capital stock of such corporation shall first be filed in the office of the clerk of the county where the mortgaged property is

situated," there is no evidence in the cause that this mortgage was executed under said statute. But if it was so executed, and even if it was true that a proper assent was not filed in the proper office by the assent of the stockholders owning at least two thirds of the capital stock of said company, upon examination of the general law, and the New York decisions, and decisions of other states, we find that this statute was enacted for the benefit of the stockholders, and that the question can not be raised by the corporation itself.

In the case of *Beecher* v. *Rolling Mill Co.*, 45 Mich. 103, (7 N. W. Rep. 695) under a statute which forbade a manufacturing company to mortgage its property unless authorized thereto by vote of stockholders holding three fifths interest, and notified of the object of the meeting called to obtain such vote, and which provides that without such notice proceedings shall not be valid, where notice was given of a meeting to authorize the issue of bonds to the extent of one hundred thousand dollars, secured by mortgage, and the meeting actually authorized an issue to the amount of one hundred and fifty thousand dollars, it was held that, so long as the corporators raised no objection to the proceedings, no one else could. Judge COOLEY, delivering the opinion of the court, says :

"The statute now under consideration was passed to protect the interests of stockholders in mining companies. It intends that their mining property shall not be conveyed away or mortgaged except by their deliberate action, after they have been notified of a proposal to do so, and have had time to deliberate upon and fully consider it. But the matter does not concern the public at large.

No principle of public policy is at stake. No wrong, direct or indirect, is done to any human being, if conveyance is made or mortgage given without the exact notice required, unless it be a wrong to the stockholders themselves ; and, as others are not concerned, why should the statute give them the right to raise questions of regularity which the stockholders elect to waive ? We are .satisfied such was not its purpose."

2 Beach. Priv. Corp. p. 1161, § 740, says : "A corpora-

tion is estopped from setting up the defence of *ultra vires* to its morgage contract when there is nothing on the face of the paper showing that it had exceeded its power."

In section 744, p. 1166, of the same volume, said author says: "The corporators and no one else, can raise objections to proceedings under acts restricting the power of the directors to mortgage."

In the case of *Bissell* v. *Railroad Co.*, 22 N. Y. 259, the Court holds: "The plea of *ultra vires*, according to its just meaning, imports, not that the corporation could not, and did not in fact, make the unauthorized contract, but that it ought not to have made it. Such a defence, therefore, necessarily rests upon the violation of trust or duty towards the shareholders, and is not to be entertained where its allowance will do a greater wrong to third parties. The acquiescence of the shareholders in the abuse will prevent the interposition of such a plea. * * * It is a good defence to a corporation, when sued upon a contract, that in making such a contract it exceeded its corporate powers; this defence being allowed not for the sake of the corporators, but for that of the public. The corporation would, however, be estopped from setting up the defence in a case where the other party to the contract could not be presumed to be cognizant of the excess of power."

In the case of *Monument Nat. Bank* v. *Globe Works*, 101 Mass. 58, the Court holds: "When want of power is apparent upon comparing the act done with the terms of the charter, the party dealing with the corporation is presumed to have knowledge of the defect, and the defence of *ultra vires* is available against him. But such a defence would not be permitted to prevail against a party who can not be presumed to have had any knowledge of the want of authority to make the contract. Hence, if the question of authority depends not merely upon the law under which the corporation acts, but upon the existence of certain extrinsic facts resting peculiarly within the knowledge of the corporate officers, then the corporation would be estopped from denying that which by assuming to make the contract it had virtually affirmed."

Now, when we refer to the mortgage which the plaintiff

is seeking to enforce in this case, it appears to have been executed to secure to the plaintiff certain moneys already advanced and to be advanced by plaintiff for the use of said company, and also to secure sixty five thousand dollars, the purchase money for the Davis tract of land, which had been sold by plaintiff to said company, and appears to have been regularly signed and sealed, and was acknowledged on 22d day of December, 1880. There is nothing, then, on the face of the paper, indicating that the corporation had exceeded its powers; and as we have seen in 2 Beach, Priv. Corp. § 740, when such is the case, a corporation is estopped from setting up the defence of *ultra vires.*

When, however, we look beyond the instrument itself, and examine the minutes of the board of trustees, a copy of which is filed in the cause, it is found that the said trustees, at a meeting held at their office in the city of New York on the 21st day of December, 1880, authorized the president and treasurer of said company to execute said mortgage; and on the same day a paper signed by more than two thirds of the stockholders of said company, assenting to the execution of said mortgage, appears to have been filed with the clerk of the county of New York and clerk of the Supreme Court of said state for said county. So that, if any of the stockholders were ignorant of the fact that said mortgage had been authorized, they need not have been, if they had taken the trouble to inform themselves.

On the 18th day of November, 1889, Ezra T. Stirling tendered his petition in this cause, representing therein that on the 20th day of October, 1880, and continuously since that time, he has been the owner of two hundred shares of stock in the Montauk Gas Coal Company; denying that said company ever made the contracts set forth in the bill with the plaintiff;—that it ever purchased from him the Davis land; and denying that said mortgage was ever properly executed, for the reason that the assent of two thirds in value of the stockholders had never been filed in the offices required by statute.

Said petitioner gave his deposition in the case, and, when asked if he was a stockholder in said company, answered,

"I believe so," and in answer to the question, "How much stock do you own?" answered, "I believe, two hundred and twenty five shares. I don't know whether that is standing on the book or not"—and, in reply to questions, stated that he did not know who was the president of said company, or board of directors, or anything whatever about the business of said company.

If he had seen proper to look after his interests, and make himself acquainted with the transactions of said company, the opportunity was afforded him; but he sees proper to wait nearly nine years after these contracts were made and this mortgage was executed, and then files his petition in this cause, asking it to be treated as an answer attacking the legality of said contracts and the validity of said mortgage. He, however, does not show, by his deposition or otherwise, that he was the owner of any stock in said company at the date of the execution of said mortgage and contracts.

It was held by the Supreme Court of the United States, in the case of *Dimpfell* v. *Railway Co.*, 110 U. S. 209 (3 Sup. Ct. Rep. 573) that in order to give standing in a court of equity to a small minority of stockholders, contesting as *ultra vires* an act of the directors, against which a large majority makes no objection, it must appear that they have exhausted all the means within their reach to obtain redress of their grievances within the corporation itself, and that they were stockholders at the time of the transactions complained of, or that the shares have devolved on them since by operation of law.

This petitioner, Stirling, however, so far from seeking any redress in the corporation, appears to have paid no attention to the practical operation of said company, never attended any of its meetings, or informed himself as to its place of business, and did not even know who was the president of said company.

In Morawitz on Private Corporations, section 630 we find the doctrine laid down: "If a shareholder fails to take the trouble of inquiring into the affairs of the corporation of which he is a member, or to attend its meetings, it seems no more than just that his supineness should be construed as an acquiescence in the proceedings of the majority."

In Green's Brice, Ultra Vires, p. 783, we find the doctrine stated thus: "If an act be thus *ultra vires*, a corporator may raise the objection, whether against a corporation or against a creditor or other contracting party attempting to enforce such act, or his alleged claims or rights resulting therefrom. But, secondly, if a corporator desire protection against a party who has thus dealt with the corporation, he must have been prompt and energetic in repudiating the transaction, as he can be bound by acquiescence. So if he do not quickly object, and give his objection vitality, the creditor will be justified in assuming that he consents."

Justice FIELD, in delivering the opinion of the court in the case of *Dimpfell* v. *Railway Co.*, 110 U. S. 210 (3 Sup. Ct. Rep. 573) says: "During these three years and eight months the earnings of the new road went into the treasury of the company, and the bonds issued upon the mortgage of that road, executed by the payment of its purchase passed into the hands of parties who bought them on the faith of contracts which had been carried out without complaint from any one. Objections now come with bad grace from parties who knew at the time all that was being done by the company, and gave no sign of dissatisfaction."

So we may say, with propriety, in regard to Ezra J. Stirling, who, if he owned his stock on the 20th day of October, 1880, and has owned it continuously ever since, as he alleges in his petition—but fails to prove—had the opportunity of knowing, and should have known, what was being done by the company; and a court of equity will not allow him to stand by for nine years, while the plaintiff in this case was expending thousands of dollars in the purchase of adjoining coal lands and in developing the coal lands already owned by the company, and shipping and marketing coal, and allow him to reap the profits if any are realized, and, on the other hand, repudiate the contracts if the venture proves unsuccessful. The doors of a court of equity are ever open to receive the complaints of the diligent, and redress their wrongs, but they are closed to those who are slothful and sleep upon their rights.

In the case of *Alexander* v. *Searcy*, 81 Ga. 545 (8 S. E.

Rep. 630) the court, in its opinion, quotes from the case of *Stewart* v. *Transportation Co.*, 17 Minn. 372 (Gil. 348) as follows: "If a stockholder assents to acts *ultra vires*, or, although not originally or expressly assenting, has for an unreasonable time acquiesced, and has permitted them to go unquestioned, so that other parties, who have acted upon the faith of them (as for instance, making large expenditures of money) would suffer great injury from their repudiation, a court of equity would not easily be induced to grant relief at the instance of such stockholders."

"In the case of *Peabody* v. *Flint*, 6 Allen, 54, a delay of three and a half years was held to be a bar. In the case of *Gregory* v. *Patchett*, 33 Beav. 595, six years were held to be a bar. In the case of *Ashhurst's Appeal*, 60 Pa. St. 290, seven years were held to be a bar."

The general rule which we deduce from these authorities, and others which we might cite, is that while a minority of the stockholders of a corporation may maintain a bill in equity, in behalf of themselves and other stockholders, for fraud, conspiracy, or acts *ultra vires*, against a corporation, its officers, and others who participated therein, when the minority stockholders have been injured or damaged by said acts, they must act promptly, and not wait an unreasonable length of time If they postpone their complaint for an unreasonable time, they forfeit their right to equitable relief. Nothing will call a court of equity into activity but conscience, good faith, and reasonable diligence. When these are wanting, the court is passive, and does nothing. *Smith* v. *Clay*, 3 Brown, Ch. 639, note.

But returning again to the question as to the due and proper execution of said contracts and mortgage: If the proofs presented by the plaintiff are to be regarded as insufficient to establish the fact that the requisite consent of two thirds in value of the stockholders of said company was regularly given, and properly filed, and that all preliminary acts necessary to authorize the execution and acknowledgment thereof were duly complied with, yet this Court, in the case of *Fidelity Ins., T. & S. B. Co.* v. *Shenandoah Val. R. Co.*, 32 W. Va. 257 (9 S. E. Rep. 180) has held that the rule is well settled that "if a contract purport to be sealed

with the seal of a corporation, and it is proven to be signed by the proper agents, the presumption is that the seal was regularly affixed by the proper authority; and a contract under seal, executed by an agent within the scope of his appointed power, will be held valid and binding upon the corporation until evidence to the contrary has been introduced. Ang. & A. Corp. § 224, 2 Mor. Priv. Corp. § 617; *Smith* v. *Smith*, 62 Ill. 493-497" * * * "It appears in proof that the stockholders of the improvement company had notice of this agreement as early as July, 1879, and that they acquiesced in it until the filing of the amended bill in this cause in April, 1885. It is true the plaintiff in this suit avers in his bill that he did not know that said agreement had not been properly executed and honestly carried into effect until after he had filed his original bill, in December, 1882; but this did not relieve him from the responsibility of acquiescence in said agreement. He had notice of the existence of this agreement, and the means of determining its validity, and it was his duty to do so. It is therefore plain, under the authorities above cited, that, even if said agreement was executed without express authority from the stockholders or directors of the company, the plaintiff in this suit, as well as the improvement company, is estopped to question or deny the authority to execute it." *Trader* v. *Jarvis*, 23 W. Va. 108; Field, Corp. § 226; Story, Ag. § 225.

Now, it appears that no secret was made of the execution of this mortgage, but it, with all of its recitals in regard to the sale of the Davis tract, was duly admitted to record in Taylor county, W. Va., on the 26th day of January, 1881, giving at least constructive notice to the world of its existence. Said Stirling then had notice of its existence, and could have made inquiry as to its validity, if he had seen proper; and it appears that a majority of the stockholders had notice at the time of the execution of said mortgage, and did not object.

In the case of *Fidelity Ins., T. & S. D. Co.* v. *Shenandoah Val. R. Co.*, above cited, it will be perceived that it was not quite six years' time, and yet this Court held that acquiescence was sufficient to work an estoppel.

In the case under consideration it was nearly nine. If, then, the contract for the sale of the Davis land to the company was duly made, sixty five thousand dollars of the money secured by this mortgage was for purchase-money of said tract, and to that extent was a lien upon the Davis tract of land, which the plaintiff was entitled to have enforced in a court of equity.

Again, the attachment sued out in this case was a foreign attachment, which was levied upon, and created a valid lien upon, all of the real estate in the bill mentioned.

The claim asserted by the plaintiff was fully proven, and, so far as the evidence discloses, contains no usury, and equity had jurisdiction to enforce said attachment lien.

For these reasons the court erred in dismissing the plaintiff's bill and quashing said attachment; and the decree complained of must be reversed, and the cause remanded to the Circuit Court of Taylor county for further proceedings to be had therein, with costs to the appellant.

REVERSED. REMANDED.