## McQUILLEN et al. v. NATIONAL CASH REGISTER CO. et al.

### No. 4593.

Circuit Court of Appeals, Fourth Circuit.

June 10, 1940.

Arthur Berenson, of Boston, Mass. (Hans Plaut, of Baltimore, Md., and Bernard Berenson, of Boston, Mass., on the brief), for appellants.

R. Dorsey Watkins, of Baltimore, Md. (James Piper and Piper, Watkins & Avirett, all of Baltimore, Md., and Shearman & Sterling, of New York City, on the brief), for appellee National Cash Register Co.

William L. Marbury, Jr., of Baltimore, Md. (John G. Rouse, Jr., and Marbury, Gosnell & Williams, all of Baltimore; Md., on the brief), for individual appellees.

J. Kemp Bartlett, Jr., of Baltimore, Md., for appellee Lee Warren James.

Before PARKER, SOPER, and DOBIE, Circuit Judges.

DOBIE, Circuit Judge.

This appeal involves an unusually complicated factual set-up and, in the lower court, Judge Coleman found it necessary to pass upon many questions of law. He filed three written opinions: 13 F.Supp. 53 (hereinafter designated the first opinion); 22 F.Supp. 867 (hereinafter called the second opinion); and 27 F.Supp. 639 (hereinafter called the third opinion). He also delivered, on July 14, 1936, an oral opinion, found in Appellants' Appendix, pp. 75–78 (hereinafter referred to as the oral opinion).[1] In these opinions, Judge Coleman discussed the facts at issue and the applicable law quite elaborately and our opinion can be appreciably shortened by reference to his opinions.

On July 13, 1939, Judge Coleman (typewritten record, pp. 922–935) filed thirty findings of fact and (typewritten record, pp. 936–939) twenty-four conclusions of law. As we are of opinion that Judge Coleman was correct in his decisions on all the essential points in this case, and as we affirm the judgment of the court below, it will not be necessary to discuss in our opinion a number of questions on which he had to pass, particularly in connection with various motions made by the parties litigant during the long period of time when this case was before the lower court.

This was a suit in equity, sometimes called a derivative suit or a stockholders' bill, in which stockholders of the corporation seek to assert by a bill in equity, making the corporation a defendant, rights of the corporation which the corporate officers or others in control of the corporation refuse, to the hurt of the plaintiffs, to assert. At the time this suit was filed, such bills in equity came under Equity Rule 27, 28 U.S.C.A. following section 723, which

---

[1] No opinion for publication.

was in effect a codification of a decision of the United States Supreme Court in Hawes v. Oakland, 1881, 104 U.S. 450, 26 L.Ed. 827. Equity Rule 27 is now embodied in Rule 23 of the Federal Rules of Civil Procedure, 28 U.S.C.A. following section 723c. This equity rule has been before the courts a great number of times. See Moore's Federal Practice, p. 2246 et seq., and Dobie on Federal Procedure, § 175.

It was also necessary in this case to invoke § 57 of the Judicial Code, 28 U.S.C.A. § 118 (concerning venue in special in rem proceedings), and Judge Coleman was called on to discuss at some length this section and the application of its provisions to the facts of the instant case.

The amended bill of the plaintiffs was filed on January 29, 1935. This amended bill was quite voluminous, often redundant and open to serious criticism as to form; but in substance it did state sufficient facts, if true, to constitute a valid cause of action or claim. This bill set out in great detail the corporate reorganization of the National Cash Register Company in Maryland and it alleged, in extenso, a conspiracy on the part of the individual defendants to deplete the treasury of the corporation and to hurt the rights of these stockholders by many illegal and fraudulent acts, which would result in the very substantial enrichment of these defendants.

The objects of the suit, or the relief sought by the amended bill, Judge Coleman thus admirably summarized in his first opinion:

"(1) To cause the cancellation of certain stock on the books of the National Cash Register Company, a Maryland corporation, one of the defendants, alleged by the plaintiffs to have been illegally issued to the other defendants, individuals; (2) to enjoin such of the defendants as are officers and directors of the defendant corporation from paying further dividends on such stock, and to cause restitution to be made to the corporation for such bonuses and dividends as may have been paid thereon to any of the defendants; and, also, restitution of salaries, bonuses, and commissions alleged to have been excessive and illegally paid to certain named defendants; (3) to cause the cancellation of an option given to a certain named defendant in connection with the alleged illegal issue of such stock; (4) to require a general accounting by the defendants for their alleged wrongful acts

in connection with the aforegoing; (5) to recover damages from the defendants for the profits realized from, or the injury caused to the company by the aforesaid acts of defendants; and (6) to recover, as general alternative relief, damages from the defendants for such transactions as cannot be enjoined or may not be advantageously or equitably rescinded and canceled, and declared null and void in the defendant company's interests. It is thus seen that all of the causes of action alleged in the bill may be grouped under two general types; first, personal actions against the various individual defendants; and, second, actions in rem against the stock itself alleged to have been illegally issued by and to certain of the defendants." (13 F.Supp. 53.)

In this first opinion, Judge Coleman had to discuss and deal with Judicial Code § 57, 28 U.S.C.A. § 118. Particularly was he concerned with the question whether, under this statute, the stock in question had a situs within the District of Maryland. See Moore's Federal Practice, p. 343 et seq., Dobie on Federal Procedure, § 122, Dobie & Ladd's Cases on Federal Jurisdiction and Procedure, pp. 532–536. It seems that before this section (which permits suit in the district in which property, real or personal, is situated) may be successfully invoked by a litigant, three essential requisites must have been fulfilled: (1) the suit must be one to enforce a legal or equitable lien upon, or claim to, the title to real or personal property, or to remove some encumbrance, lien or cloud upon the title of such property; (2) the proceeding must be in aid of some pre-existing claim, existing prior to the suit in question, and not a proceeding to create for the first time a claim to the property as the effect of the proceeding itself; (3) the property in question must have a situs within the district in which suit is brought in a federal district court. Since the National Cash Register Company was incorporated under the laws of the State of Maryland, Judge Coleman held that its stock, for the purposes of section 57 of the Judicial Code, 28 U.S.C.A. § 118, had a situs within the District (and State) of Maryland. We believe this conclusion is correct. As did he, so do we, believe that this holding is justified by the decisions of the U. S. Supreme Court in Jellenik v. Huron Copper-Mining Co., 177 U.S. 1, 20 S.Ct. 559, 44 L.Ed. 647, and Schultz v.

Diehl, 217 U.S. 594, 30 S.Ct. 694, 54 L.Ed. 896. The Jellenik case was cited and approved in this connection by the Supreme Court in Rogers v. Guaranty Trust Co., 288 U.S. 123, 132, 53 S.Ct. 295–298, 77 L.Ed. 652, 89 A.L.R. 720. See also, Rose, Federal Jurisdiction and Procedure (5th Ed.) § 318.

The contention was made that even if this was formerly the law, it was changed by the adoption in Maryland (and the Maryland law should here control) of the Uniform Stock Transfer Act, Code Pub. Gen.Laws Md., 1924, art. 23, §§ 38–60. We do not believe that this Act made any such change, and we believe with Judge Coleman, that a decision to that effect in Harvey v. Harvey, 290 F. 653, by the Circuit Court of Appeals of the Seventh Circuit, is a correct statement of the law.

As error No. 1 in this case, appellants assigned the refusal of Judge Coleman to order, under Jud.Code § 57, 28 U.S.C.A. § 118, substituted service on the defendants Behr, Phillips, Bennett, Haswell, R. D. Patterson, McCain and Rentschler. Judge Coleman justified this refusal on the ground that these individual defendants were not indispensable parties to the proceedings; while, at the same time, he did order such substituted service upon the following as indispensable defendants: Dillon, Read & Co., Frederick B. Patterson, Edward A. Deeds, S. C. Allyn, Ezra M. Kuhns, William Hartman, J. H. Barringer, C. E. Steffey and Lee W. James. Though we are inclined to believe that, in refusing to order this substituted service upon the individual defendants in question, Judge Coleman's ruling was correct, it is not necessary for us to pass definitely on this ruling. Even if the ruling be erroneous, we do not think that there was any substantial impairment of any real right of appellants in the light of the ultimate disposition which was made of this case. This is particularly true of his decision limiting the lower court's jurisdiction to proceedings strictly in rem against the stock of the National Cash Register Company.

As to alleged error No. 2, we think the same observations may be made as to the rescission, made on July 1, 1936, by Judge Coleman of the pro confesso and final decree, which he had previously entered as to the defendants Patterson and Steffey.

▪ The third error assigned by appellants covers the order of the lower court covered in the oral opinion (appellants' appendix, pp. 75–78) delivered on July 14, 1936, when, over the opposition of the appellants, the court granted the motion of the appellees striking out all matters in the amended bill sounding in personam and limiting the jurisdiction of the court to such claims of the appellants as were claims in rem against the stock of the National Cash Register Company. Appellants particularly objected to the ruling of the trial judge that the appearance of the appellees for the purpose of this motion amounted only to a special appearance and did not constitute in fact or in law a general appearance which would subject the moving appellees to jurisdiction on the part of the court against them in personam. Here again, we agree with the ruling of Judge Coleman. It must be remembered that service on these defendants was had only by substituted service and not by personal service on them within the district of Maryland. In Grable v. Killits, 6 Cir., 1922, 282 F. 185, it was said at page 194, citing Pennoyer v. Neff, 95 U.S. 714, 24 L.Ed. 565: "It is fundamental that relief of that character [i. e., a personal judgment or decree] cannot be had against nonresident defendants without personal service of process within the jurisdiction or such general appearance in the case as amounts thereto."

▪ The facts in the Grable case were in many respects similar to those of the instant case, and certiorari was denied by the Supreme Court, 260 U.S. 735, 43 S.Ct. 95, 67 L.Ed. 488. As the federal courts are courts of limited jurisdiction, and as there are many federal statutes dealing with these courts in such fields as venue and process and jurisdiction, it is highly important that litigants should be permitted to raise many seemingly technical questions by a special appearance in limine; and it would indeed be an unfair attitude were the federal courts, under such circumstances, too prone to treat a special appearance as a general appearance. As Judge Coleman well said in his oral opinion (appellants' appendix, p. 75): "Parties may appear specially, without their actions in so doing being construed as a general appearance, provided such special appearance, of course, is made seasonably, that is, before the one so appearing has done anything with respect to meeting the merits of the case which would amount to a waiver of, or, in fact, an estoppel against

the right to assert that the special appearance was not actually a general appearance.".

█ .We think the appearance of the appellees here, to move that the jurisdiction of the court be limited to in rem proceedings against the stock of the National Cash Register Company, was, in both law and fact, a special appearance. The lower court, accordingly, was correct in so treating it. See also Fitzgerald & Mallory Construction Co. v. Fitzgerald, 137 U.S. 98, 106, 11 S.Ct. 36, 34 L.Ed. 608, and compare Robertson v. Railroad Labor Board, 268 U.S. 619, 45 S.Ct. 621, 69 L.Ed. 1119. We find nothing, though the appellants so contend, in Big Vein Coal Company of West Virginia v. Read, 229 U.S. 31, 33 S.Ct. 694, 57 L.Ed. 1053, that militates against the views that we have expressed; and, while some of the language of Judge Woolsey in Bede Steam Shipping Company v. New York Trust Company, D.C., 54 F.2d 658, may be opposed to these views, we are not disposed to follow that language.

█ Error No. 4 alleged by the appellants relates to matters covered in Judge Coleman's second opinion, in which he went into these matters in great detail. In stockholders' bills, Equity Rule 27 (now Federal Rules of Civil Procedure, Rule 23) requires the plaintiff to allege, among other things, that he was a "shareholder at the time of the transaction of which he complains, or that his share had devolved on him since by operation of law". Judge Coleman found, quite properly we think, that the shares in question were not a part of the trust estate when appellants became trustees, but that they were subsequently purchased by the appellants as trustees. Accordingly he held, again we think properly, that these shares did not devolve upon appellants by operation of law and that they thus could not complain of any transactions alleged to be illegal and fraudulent which had occurred before the appellants acquired this stock. Since Equity Rule 27 was adopted as a result of the decision in Hawes v. Oakland, supra, the United States Supreme Court has insisted upon a rather rigid compliance with this rule. See Dimpfell v. Ohio, etc., Ry. Co., 110 U.S. 209, 3 S.Ct. 573, 28 L.Ed. 121; Corbus v. Alaska Mining Co., 187 U.S. 455, 23 S.Ct. 157, 47 L.Ed. 256; Venner v. Great Northern Ry. Co., 209 U.S. 24, 28 S.Ct. 328, 52 L.Ed. 666; City of Quincy v. Steel, 1887, 120 U.S. 241, 7 S.Ct. 520, 30 L.Ed. 624. See, also, Krouse v. Brevard Tannin Co., 4 Cir., 1918, 249 F. 538; Moore's Federal Practice, p. 2263; 13 Fletcher, Corporations, § 5972; Dobie, Federal Procedure, § 175. The purpose of the rule seems to be salutary and we should not encourage attempts to evade its provisions. There are some state decisions to the contrary. Probably the leading case on this side of the question is Pollitz v. Gould, 202 N.Y. 11, 94 N.E. 1088, 38 L.R.A., N.S., 988, Ann.Cas.1912D, 1098. See, also, Seaton v. Grant, L.R.[1867] 2 Ch.App. 459. The great majority of the highest state courts, however, seem to favor the doctrine involved in the rule. Home Fire Ins. Co. v. Barber, 67 Neb. 644, 93 N.W. 1024, 60 L.R.A. 927, 108 Am.St.Rep. 716; Alexander v. Searcy, 81 Ga. 536, 8 S.E. 630, 12 Am. St.Rep. 337; Boldenweck v. Bullis, 40 Colo. 253, 90 P. 634; Clark v. American Coal Co., 86 Iowa 436, 53 N.W. 291, 17 L.R.A. 557; Fletcher, Cyc.Corp. § 5981.

We need not decide whether, since the decision in Erie Railroad Co. v. Tompkins, 304 U.S. 64, 69, 58 S.Ct. 817, 82 L.Ed. 1188, 114 A.L.R. 1487, we are bound here to follow the applicable state law, which would quite clearly be the law of Maryland; for the Maryland doctrine is in line with the rule. Matthews v. Headley Chocolate Co., 1917, 130 Md. 523, 532–534, 100 A. 645. See, also, Tompkins v. Sperry, Jones & Co., 1903, 96 Md. 560, 54 A. 254.

We agree, too, with the trial judge that, in connection with the "B" shares, the wrong complained of is the illegal issuance of these shares and clearly the issuance of these shares was prior to date when appellants acquired their stock.

█ The lower court held, as to the appellants' attempt to cancel the "A" stock issued in lieu of back dividends due to the holders of these shares, that the failure to join as defendants the owners of such shares was a fatal defect. Appellants attempted to obviate this difficulty by contending that such failure was not necessary because they brought a representative suit under Equity Rule 38, 28 U.S.C.A. following section 723. We think the cases cited by Judge Coleman in his second opinion, and the arguments that he used very effectively dispose of this contention, particularly is it true, as he held, that the absent shareholders are in no sense adequately represented by the corporation, the National Cash Register Company.

Appellants attack as the alleged fifth error, Judge Coleman's order of November 10, 1938, limiting the depositions to be taken by appellants to an inquiry into "(1) the transaction resulting in the exchange of 'C' and 'A' shares of the National Cash Register Company for 'B' shares of said Company, and (2) the option to the defendant Deeds". In this order, the lower court "excluded from any such depositions any inquiry into the issuance, underwriting or disposition of the 1,100,000 'A' shares and the 400,000 'B' shares in 1926, or the issuance of 90,000 'A' shares in 1928." In the light of other rulings by Judge Coleman, we believe this was an entirely proper exercise of his discretion. We feel also that by virtue of these other rulings, even if the learned judge here were in error, no substantial harm could have resulted to the appellants from this order.

The sixth and last error assigned by appellants relates to the action of Judge Coleman in dismissing the amended bill after, in his third opinion, he decided, adversely to the appellants, the two important questions remaining in the case. In the first of these, he declared valid the contested issuance of 200,000 shares of "C" stock in exchange for the 400,000 shares of "B" stock still outstanding. In dealing with the second question, he upheld the validity of the contested option contract between the National Cash Register Company and Colonel Deeds, one of the defendants. Of these in their order.

■■■■ As to the first question, the validity of the issuance of "C" stock is a question to be controlled solely by the applicable Maryland law. The major premise here, as stated by Judge Coleman, with what we consider ample support in Maryland cases, is [27 F.Supp. 647]: "It is not the function of a court of equity to attempt to substitute its judgment for that of the persons who are lawfully in control of a corporation's affairs, once it has determined that their conduct is neither ultra vires, fraudulent, illegal, nor grossly negligent."

In this connection, Judge Coleman discussed in his opinion this problem under three headings: "(1) The corporate action taken;" (2) "How the corporate action was taken"; and (3) "The authority by statute and charter to take it".

It would unduly prolong this opinion were we to review at great length, as did Judge Coleman, the many and varied incidents and aspects of these transactions. It will be sufficient, we think, for us to refer to Judge Coleman's opinion and to discuss briefly only certain important features of the transactions in question. We believe that Judge Coleman's analysis of the facts is quite fair and is amply borne out by the record; also, we think, he correctly applied the Maryland law and he arrived at a proper conclusion in deciding that the issuance of these "C" shares was valid both under the charter of the National Cash Register Company and under the corporation laws of the State of Maryland.

■■■■ Much was attempted to be made by appellants as to the unfortunate error of the Secretary of the National Cash Register Company in reporting to the Maryland State Tax Commission that the change in capital structure had been authorized by two-thirds of the stockholders of each class, when, in fact, this was not strictly true, since the proposed change had been authorized by two-thirds of the outstanding shares of the different classes of stock when these were considered as a single class. We see here no badge of fraud or illegality and since we sustain Judge Coleman's holding that under the charter of the National Cash Register Company and under the corporation laws of the State of Maryland, this change in capital structure was proper in its inception and was duly carried out, in pursuance of this charter and in conformity to these laws, this error on the part of the Secretary was neither substantial nor material. We think Judge Coleman further demonstrated that an increase or decrease in the amount of, or a change in the nature of, corporate stock by a corporation, has necessarily no real bearing upon either the actual value of its shares of stock or upon the actual value of the corporate assets behind its shares. And he clearly shows that the reduction in the capitalization of the National Cash Register Company in the present case did not involve any parting with assets of the corporation.

■■■■ This brings us to a consideration of the second question involved in the third opinion: the validity of the option contract between Colonel Deeds and the National Cash Register Company. Here we believe the chief apposite principle of law, quoted by Judge Coleman, again with a citation of authorities, is found in Wight v. Heublein, 4 Cir., 238 F. 321, at page 324: "It is obviously not the province of a court of

equity to act as the general manager of a corporation or to assume regulation of its internal affairs. If the chosen directors, without interests in conflict with the interest of stockholders, act in good faith in fixing salaries or incurring other expenses, their judgment will not ordinarily be reviewed by the courts, however unwise or mistaken it· may appear; but this is far from saying that equity will refuse to redress the wrong done to a stockholder by the action or policy of directors, whether in voting themselves excessive salaries or otherwise, which operates to their own personal advantage, without any corresponding benefit to the corporation under their control." ·

Judge Coleman discussed this problem at some length. The salient facts may be briefly summarized. The National Cash Register Company was the largest company of its kind in the world and, literally, its far-flung business interests extended to the uttermost parts of the earth. The Company found itself in quite a critical situation. It seemed to those persons in control of the corporation's affairs that here was a desperate disease, which could be cured only by a desperate remedy. The outstanding need was for a capable executive of wide knowledge, broad experience and the ability to deal with big business problems promptly and decisively in a· big business way. After a careful canvass of the entire field, the choice of the powers-that-were fell upon Colonel Deeds. His record seemed to justify the wisdom of this choice.

When Colonel Deeds was approached, he must have known, at least in broad outline, the paramount facts of the situation. Too, he must have appreciated how dire was this Company's supposed need for him and he was in a position to drive a bargain that was quite advantageous to himself. Certainly, here, he was quite within his own legal rights. He was to receive a salary of $100,000 a year, even though he was not to give his entire time to this company. He also desired, and this condition of his was met, an option contract providing for the purchase by the company of 50,000 shares of its common "A" stock, and the granting to Colonel Deeds of an option to purchase this stock from· the company, in installments, at an average cost price, over a period of five years. Once having purchased the stock under his option, Colonel Deeds would, of course,

face the possibility of a loss, should the stock he had purchased decline below the price he paid for it under his option; but, on the other hand, if Colonel Deeds made a success of the company's operations and the stock he had purchased under his option advanced to a figure above and beyond that at which he had purchased, he would necessarily, by that token, be the gainer. This price, and the other terms of the option contract, made this option contract ostensibly and probably, at least, an extremely desirable element from the viewpoint of Colonel Deeds in his employment contract with the National Cash Register Company.

▇▇▇ In situations of this kind, the courts must distinguish between compensation which is merely excessive and is thus lawful, and compensation ˙which is actually wasteful and is thus unlawful. Courts cannot here condone on the part of those in control of a corporation either actual bad faith or a total neglect or even utter indifference to the rights of stockholders. Necessarily, much must be entrusted to the discretion of corporate directors and courts should intervene here if, and only if, there has been so clear an abuse of this discretion as to amount ˙legally to waste.

▇▇▇ We think there can be little or no question that the employment contract between Colonel Deeds and the National Cash Register Company was duly authorized by appropriate corporate action and was executed in the needed form and with proper solemnity. We believe, too, there is nothing in the record to show that this contract was tainted with any elements of fraud. Indeed, we think we can go further and state that this contract was made by the corporate officials in the sincere and honest belief that the contract would inure to the best interests of the stockholders of the corporation. Finally, in this connection, we agree with Judge Coleman that there was nothing in the charter of the corporation or the corporation laws of the State of Maryland which would render this contract illegal or ultra vires.

Thus, we are constrained to uphold Judge Coleman's decision that this option contract was lawful and proper and that it was based upon a sufficient consideration in the agreement by Colonel Deeds to assume the headship, and to direct the policies, of a great corporate enterprise.

Accordingly, no tenable ground has been advanced which would justify us in overruling Judge Coleman's decision by declaring this employment contract invalid.

There are not a few other questions involved in this case. It is not necessary for us, of course, on this appeal, to pass on those holdings of the trial judge which were favorable to the appellants, although their contention appears to be that these were very few and exceedingly far between. We have, we think, passed on those major questions decided in the lower court adversely to the appellants which were made the principal bases of this appeal. Our decision of the major questions is sufficient, in our opinion, to obviate the necessity of passing upon the minor questions. And, finally, in deciding the major questions in line with the conclusions which Judge Coleman reached, we think we are warranted in affirming the judgment in the court below.

Accordingly, the judgment of the United States District Court in this case is affirmed.

Affirmed.